Eric **WALLER, as Personal Representative of the Estate of Doris Taylor, Deceased, Plaintiff,**

v.

**David TRIPETT, Individually, Defendant.**

No. 01–71225.

United States District Court, E.D. Michigan, Southern Division.

Sept. 28, 2001.

Reconsideration Denied Nov. 28, 2001.

Kelly A. Pruse, Norbert B. Leonard, Leonard Kruse, Bloomfield Hills, MI, P.C., for Plaintiff.

Mark Matus, C. Adam Purnell, Lansing, MI, for Defendant.

### ORDER

JULIAN ABELE COOK, Jr., District Judge.

In the case at bar, the Plaintiff, Eric Waller, acting in his capacity as the personal representative of the Estate of Doris Taylor, has charged the Defendant, David Tripett with promoting employment policies which caused his mother's death.

On April 5, 2001, Tripett filed a motion to dismiss the case, arguing that (1) the law does not support any cause of action against him, and (2) he is shielded from liability on the basis of the doctrine of qualified immunity. The two primary issues that are raised by this motion are reasonably straightforward. First, did Tripett violate the substantive component of the Due Process Clause of the Fourteenth Amendment? Second, if there was a constitutional violation, is he entitled to immunity for his actions? For the reasons that are set forth below, the Court will grant in part, and deny in part Tripett's motion.

### I

At the time of her death, Taylor was working as a food service steward at the Thumb Correctional Facility in Michigan (TCF), where she had been employed for more than ten years.[1] During all of the times that are relevant to this controversy, TCF was under the direction of Tripett, who served as its warden and as Taylor's ultimate supervisor.

On May 17, 1998, Gerald Barnes and other inmates were assigned to routine kitchen duties at TCF. Barnes had been imprisoned after having been convicted of committing a criminal sexual assault with a knife.

According to the Complaint, Taylor advised an unnamed party that she did not want Barnes to come near her because of his alleged history of knife related assaults. Nevertheless, Barnes was given access to knives in the kitchen while Taylor was there.[2] Using one of these implements, he followed her out of the kitchen and into an unsecured hallway where she was stabbed. Taylor died a few hours later.

Here, the Plaintiff maintains that Tripett had instituted several institutional policies and practices, all of which contributed to his mother's untimely death, in that Tripett (1) permitted felons to possess dangerous knives without providing adequate supervision and security precautions; (2) allowed inmates to handle deadly weapons without adequate background reviews; (3) failed to install sufficient emergency measures, such as a safety transceiver in the hallway where Taylor was murdered; and (4) neglected to maintain adequate medical staff and facilities.

### II

In his motion, Tripett contends that Waller has failed to state a claim upon which relief can be granted. Under Federal Rule of Civil Procedure 12(b)(6), a party may present such a request to test

---

1. The facility houses felons who have committed milder offenses and are between the ages of seventeen (17) and twenty-one (21). Offense levels are classified on a scale of one to six, with Level I covering the least egregious offenses. Although the correctional center generally houses inmates who have committed Level II offenses, it contained persons whose crimes warranted a Level III or IV classification at the time of Taylor's death.

2. Contrary to an existing statewide policy, the kitchen knives were untethered.

whether a cause of action has been adequately pled in the Complaint.[3] The Court must accept Waller's allegations as true and will construe them liberally in his favor. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987); *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir.1976). At the same time, any legal conclusions or unwarranted factual inferences need not be assumed. *See Morgan*, 829 F.2d at 12; *Westlake*, 537 F.2d at 858.

▇▇▇▇ Importantly, the Court will not dismiss a pleading merely because it does not state all the elements which give rise to a legal basis of recovery or because the aggrieved party has misconceived the proper theory if relief can be granted under any theory. *See Myers v. United States*, 636 F.2d 166, 169 (6th Cir.1981). Instead, a dismissal should only be permitted "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Al-*

*lard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1240 (6th Cir.1993).

### III

The question of whether the Due Process Clause of the Fourteenth Amendment[4] provides a right, which was allegedly infringed by Tripett in the fulfillment of his duties as a warden, appears to be an open one. The Supreme Court has never squarely addressed the rights of the public against a State in relation to those injuries that are caused by people who are within its custody.[5] Likewise, the United States Court of Appeals for the Sixth Circuit has not had an opportunity to officially address a set of analogous circumstances.[6]

On the one hand, it is clear that when the State actively takes and holds a person without consent—as in the case of a prisoner or an involuntarily committed mental patient—there is "a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney, v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Thus, an inmate has

---

**3.** The minimal pleading requirements of Federal Rule of Civil Procedure 8(a), which requires only a "short and plain statement of the claim," govern the assessment of the Complaint. Under this standard, a pleading is sufficient if it gives the Defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir.1976). By the same token, the cause must provide a " 'statement of circumstances, occurrences, and events in support of the claim presented .... [T]he complaint must disclose information with sufficient definiteness.' " *Veney v. Hogan*, 70 F.3d 917, 921–22 (6th Cir.1995) (citation omitted).

**4.** Waller has also invoked the Due Process Clause of the Fifth Amendment. However, whereas the Fourteenth Amendment applies directly to the States, the Fifth Amendment constrains federal action. *See Barron v. City*

*of Baltimore*, 32 U.S. (7 Pet.) 243, 250–51, 8 L.Ed. 672 (1833) (Fifth Amendment "is intended solely as a limitation on the exercise of power by the government of the United States, and is not applicable to the legislation of the states."), *cited in United States v. Balsys*, 524 U.S. 666, 674, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998). Hence, the Court will analyze Waller's claim under the strictures of the Fourteenth Amendment.

**5.** A milder form of the question was reserved in *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), and was left unresolved with respect to the instant issue in *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196–97, and especially at 197 n. 4, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

**6.** Only unreported opinions have expressly commented on this issue.

substantive rights under the Due Process Clause to receive certain protections of the State. On the other hand, it is equally well established that, in the absence of a State action which contributes to the claimed injury, the Fourteenth Amendment offers no substantive rights. *See id.; see generally United States v. Guest,* 383 U.S. 745, 755, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966) (" 'The Fourteenth Amendment protects the individual against state action, not against wrongs done by individuals.' ") (quoting *United States v. Williams,* 341 U.S. 70, 92, 71 S.Ct. 581, 95 L.Ed. 758 (1951) (Frankfurter, J., dissenting)). If neither the aggressor nor the victim is in the State's custody, the Due Process Clause does not provide any relief to a person who suffers grave harms at the hands of another even if the danger is or should be evident to governmental officials. *See DeShaney,* 489 U.S. at 200, 109 S.Ct. 998. Since the State, in such circumstances, has neither aided the aggressor in the violent act nor prevented the victim from responding, it owes no constitutional duty to thwart the acts of violence.

However, the instant case falls somewhere between these two poles since the aggressor was in custody but the victim was not under similar institutional constraints.[7] If (1) the State placed an individual in custody, (2) its officials knew or should have known that the inmate presented a particular kind of danger to other persons, and (3) the policies and practices of its officials gave the prisoner an opportunity, as well as the means, with which to continue his violent *modus operandi,* did the failure of the State to protect foreseeable victims constitute a deprivation of their lives or liberties without due process of law?

The Fourteenth Amendment provides, among other things, that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1 cl. 3. At its core, the clause protects the public against arbitrary action by the State. *See County of Sacramento v. Lewis,* 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); 1 Lawrence H. Tribe, *American Constitutional Law* § 8–1, at 1335 (3d ed.2000). As such, it serves to " 'prevent the government from abusing [its] power, or employing it as an instrument of oppression,' " *DeShaney,* 489 U.S. at 196, 109 S.Ct. 998 (quoting *Davidson v. Cannon,* 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)), *quoted in Collins v. City of Harker Heights,* 503 U.S. 115, 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), and it prohibits "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Lewis,* 523 U.S. at 842, 118 S.Ct. 1708.

In furtherance of these aims, the clause dictates a baseline[8] of accept-

---

**7.** After *DeShaney,* the Supreme Court has offered no additional guidance that would be decisive. The case of *Collins v. City of Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), concerned the duties of the State in its capacity as an employer whose policies arguably result in death or injury. Here, however, the Court is not addressing responsibilities that allegedly arise out of the employment relationship. Instead, it is addressing the duties of a State that creates a danger by arming a prisoner. Thus, the principles of *Collins* are inapposite. *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct.

1708, 140 L.Ed.2d 1043 (1998), expressly pertains to extreme situations in which an official lacks any time for reflection. It does not govern situations, like those at issue, when an officer forms a policy after due reflection.

**8.** The line is not necessarily drawn so as to parallel the tort-related concept of reasonable care. *See, e.g., Lewis,* 523 U.S. at 848–49, 118 S.Ct. 1708 (explaining distinctions between State tort law and constitutional due process); *Collins,* 503 U.S. at 128, 112 S.Ct. 1061 (discussing settled principle that substantive due

able governmental conduct.[9] Through its substantive component, it "protects individual liberty against 'certain governmental actions regardless of the fairness of the procedures used to implement them.'"[10] *Collins*, 503 U.S. at 125, 112 S.Ct. 1061; *see Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). With respect to executive actions, the litmus test for determining if the government abuses its power and infringes upon personal freedom is whether the contested act shocks the judicial conscience. *See*

*Lewis*, 523 U.S. at 846–47, 861 n. 2, 118 S.Ct. 1708 (Scalia, J., concurring in the judgment) (the "shocks-the-conscience" test has been applied not only in connection with executive acts, but also with respect to at least one legislative action);[11] *Collins*, 503 U.S. at 128, 112 S.Ct. 1061; *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

 Despite the potential breadth of these words, the Court uses caution in interpreting them in order to shun a slide

process is not equivalent of traditional tort law).

**9.** The general mores, which are embodied by the amendment, can be supplanted by specific constitutional provisions. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001) (discussing *Graham v. Connor*, 490 U.S. 386, 388, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); *Lewis*, 523 U.S. at 842, 118 S.Ct. 1708 (discussing *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion)); *Graham*, 490 U.S. 386, 109 S.Ct. 1865. Nevertheless, where more particular language is absent, it is well settled that the clause "guarantees more than fair process." *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).

**10.** The doctrine of substantive due process has varied origins and applications, *see* John E. Nowak & Ronald D. Rotunda, *Constitutional Law* ch. 11 (5th ed.1995), and attempts to articulate a unified theory are, at best, difficult. *See Moore v. City of E. Cleveland*, 431 U.S. 494, 502, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) ("Substantive due process has at times been a treacherous field for th[e Supreme] Court.").

**11.** Insofar as the test applies to legislative action, the judicial conscience is shocked when the government attempts to regulate matters that are so personal as to warrant complete protection from encroachment. In this way, substantive due process protects freedoms "'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (plurality opinion) (quoting *Snyder v.*

*Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934) (Cardozo, J.), *overruled on other grounds*, *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). Such interests are "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937) (Cardozo, J.), *overruled on other grounds*, *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

To be recognized as an infringement upon a fundamental right, an act must, by an articulable analogy, be so tightly related to conduct that has long been deemed to be the object of clear repugnance. For example, the Supreme Court has held that such domains of personal liberty include the "freedom to enter into and carry on certain intimate or private relationships," *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987), *cited in Boy Scouts of Amer. v. Dale*, 530 U.S. 640, 698, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (Stevens, J., dissenting), the liberty "of parents in the care, custody, and control of their children," *Troxel*, 530 U.S. at 65, 120 S.Ct. 2054, the right to be free from the imposition of grossly excessive punishments upon tortfeasors, *Cooper Indus. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 1684, 149 L.Ed.2d 674 (2001), and the "rights to marry, to have children, ... to marital privacy, to use contraception, to bodily integrity, and to abortion." *Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (numerous citations omitted).

into utter subjectivity. The Due Process Clause, which ostensibly guards against arbitrariness, must not itself become arbitrary in its application. Years of precedent have provided some guidelines as to how to conduct the inquiry. *See Lewis,* 523 U.S. at 858, 118 S.Ct. 1708 (Rehnquist, J., concurring). When emergency circumstances are presented, an official's action will not shock the judicial conscience unless it evinces malice or an intent to inflict harm. *See Lewis,* 523 U.S. at 853–54, 118 S.Ct. 1708 (discussing *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). By contrast, if an official has the opportunity to deliberate over a matter, the judiciary will not be shocked unless an official acts in a way that exhibits deliberate indifference to others' rights. *Id.* at 851–53, 118 S.Ct. 1708 (discussing well settled standards controlling the creation of prison policy); *but see id.* at 855–56, 118 S.Ct. 1708 (Rehnquist, J., concurring) (describing "shocks the conscience" and "deliberate indifference" as two separate tests). The term "deliberate indifference" refers to "something more than mere negligence, [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (construing Eighth Amendment). When a person who is not a prisoner alleges that a constitutional tort has occurred, a policymaking official is deemed to be deliberately indifferent when he disregards an obvious risk of a harm that is likely to result in the violation of constitutional rights. *Id.* at 840–42, 114 S.Ct. 1970 (discussing *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *compare id.* at 837, 114 S.Ct. 1970

(in order to show deliberate indifference to prisoner's rights under Eighth Amendment "the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference"); *Estate of George v. State of Mich.,* 136 F.Supp.2d 695, 701 (E.D.Mich. 2001) (applying Eighth Amendment test to claim of injured pretrial detainee).

■ In this case, many of Waller's allegations fail to identify conduct that is conscience-shocking in the constitutional sense. For example, neither the State nor Tripett had any duty, in their capacities as Taylor's employers, to protect her from unreasonable existing risks. *See Collins,* 503 U.S. 115, 112 S.Ct. 1061; *Lewellen v. Metropolitan Gov't of Nashville,* 34 F.3d 345, 351 (6th Cir.1994). Prisons are dangerous places, and the people who work in them are generally not entitled to receive any recovery if some unexceptional danger results in an injury unless their exposure to a risk was intended to be some form of punishment. *See Collins,* 503 U.S. 115, 112 S.Ct. 1061; *Metropolitan Gov't of Nashville,* 34 F.3d at 351. Similarly, the State has broad authority in its determinations as to how to allocate resources. *See Collins,* 503 U.S. at 128–29, 112 S.Ct. 1061. As Taylor became increasingly uncomfortable with general issues of prison overcrowding, the lack of security personnel, and the absence of electronic emergency transceivers, the burden was upon her to take reasonable steps to protect herself from harm.[12] As such, these allegations are subject to dismissal.

■ However, although a generalized employment risk is insufficient to render

---

12. Undoubtedly, this is easier said than done, especially when a correctional facility is a bedrock of the local economy. Moreover, part of the tragedy in this case is that Taylor was on the verge of retiring from her job. Nevertheless, the law will not support her claims to the extent that they arise out of the existence of generalized employment hazards.

the State liable, the affirmative creation of a particular hazard or danger in relation to a discrete group of employees is a different matter. In contrast to the facts in *Collins,* Taylor was allegedly ordered to work under circumstances "when the supervisor knew or should have known that there was a significant risk that [she] would be injured." 503 U.S. at 125, 112 S.Ct. 1061. Accepting the allegations of Waller, as the personal representative of the Deceased, in the most favorable light, the situation in the TCF kitchen on May 17, 1998 was compounded when the State indirectly armed a prisoner with his choice of weaponry without adequate supervision. *See Duvall v. Ford,* 187 F.3d 635 (Table), 1999 WL 486531, at *3 n. 1 (6th Cir.1999) (discussing *Nishiyama v. Dickson County,* 814 F.2d 277 (6th Cir.1987) (en banc) (State's provision of device used to cause harm can meet State-action requirement)), *rev'g on other grounds recog'd by Lewellen,* 34 F.3d 345 (6th Cir.1994) (gross negligence is not sufficient, deliberate-indifference test applies to review of official action). *Contra Collins,* 503 U.S. at 117–18, 112 S.Ct. 1061 (city did not create noxious sewer gas that caused death by asphyxiation); *Nobles v. Brown,* 985 F.2d 235, 236 (6th Cir.1992) (no violation of due process where prisoner, of own volition and resources and without prior knowledge of State officials, continued pattern of violent kidnapping and rape). In such a case, the State has done something "to render an individual more vulnerable to danger." *Davis v. Brady,* 143 F.3d 1021, 1025 (6th Cir.1998) (quoting *Gazette v. City of Pontiac,* 41 F.3d 1061, 1065 (6th Cir.1994)) (internal quotation marks omitted), *cited in Weeks v. Portage County Exec. Offices,* 235 F.3d 275, 278 (6th Cir. 2000) (executive liability can attach when official "affirmatively acted to put the victim in a more vulnerable position that [sic] he would have been otherwise."); *compare Nobles,* 985 F.2d at 236 (prison officials did not ostensibly know of prisoner's malfunctioning cell lock or provide him with weapon).

Here, Tripett presumptively made an intentional decision to institute a practice that (1) appears to have contravened the State-wide policy, and (2) provided an untethered knife without adequate supervision to a man who had a recent history of committing a violent crime with the aid of knives.[13] In this limited respect, the Court is persuaded that Tripett ostensibly created a specific danger and, thereby, was deliberately indifferent to Taylor's rights. This conduct, especially when taken as true, shocks the judicial conscience of the Court. As such, a dismissal on these allegations is unwarranted.

IV

At this point, it is worthwhile to pause and to offer an alternative justification for the Court's disposition. Over the years, the members of the Supreme Court have expressed varying degrees of willingness to rely upon the "shocks the conscience" test due, in part, to the amorphous nature of the judicial conscience. Fortunately, the resolution of the dispute in the case at bar can be achieved without invoking the "substantive component" of due process. The straightforward procedural aspect of

---

**13.** It is not necessary for Tripett to have been specifically notified that Barnes would receive a knife if it was obvious that a similarly situated offender would be imprudently armed by the policy. *See Farmer,* 511 U.S. at 843, 114 S.Ct. 1970 (Even under the more stringent test of the Eighth Amendment, a prison official may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.")

the doctrine is sufficient to address the facts and circumstances that the parties have submitted to the Court for a resolution.

The Due Process Clauses of the Fifth and Fourteenth Amendments exist to ensure that choices about how to exert the great authority of government are neither arbitrarily nor recklessly imposed upon the citizenry of the United States. Each branch of government is charged with the task of making decisions among competing interests. According to the principles of due process, the decisions of each branch of government must be made pursuant to some basic methodological framework in order to assure the appropriate measure of reliability and consistency. The strictures of procedural due process delineate the methodology of choice. An analysis of the substantive due process issue is relevant only if a court determines that a particular freedom is not properly subject to the decision-making authority of the government.

The Constitution allows procedural standards to vary in order to account for the forum and circumstances in which a decision is made. In matters of law enforcement and executive action, the Supreme Court has described the character of the process by which an official reaches a legitimate decision. If the official is acting in an emergency situation, the courts expect only a decision making process that is free from an intent to inflict harm. *See Lewis*, 523 U.S. at 853–54, 118 S.Ct. 1708 (discussing *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). If the official has ample time to contemplate or set policy, the Constitution mandates a procedure that, at least, does not manifest a deliberate indifference to

the rights of the citizenry. *Id.* at 851–52, 118 S.Ct. 1708. These are the minimally adequate procedural standards that merit the distinction of being "due." They do not directly pertain to the *substance* or the subject matter of the conduct that is governed. If a member of the executive branch is so careless as to trip over these low hurdles and the result is the loss of life, liberty, or property, the courts can—in good conscience—say that the administrative regime was so inadequate that it failed to meet the procedural standards of "due process."

Notwithstanding, the doctrine of substantive due process remains generally relevant to executive action. For example, an executive order or a policeman's act—no matter how well thought out—could impinge upon a fundamental liberty. Here, the Court merely notes that procedural due process might provide a better textual support for the applicable standards while obviating the controversial need to resort to the language of "conscience-shocking." Under this analysis, Waller's allegations would be tenable for the same reasons that were set forth in the prior section.

## V

Having found that the Complaint states a cognizable claim for a violation of Taylor's constitutional rights, the Court turns to consider whether Tripett is immune from liability.

## A

■■■ The doctrine of qualified immunity "extends to government officials [who are] performing discretionary functions."[14] *Blake v. Wright*, 179 F.3d 1003,

---

14. Although Tripett must initially plead the defense, the burden then shifts to Waller to demonstrate that such immunity is not appro-

priate. *Blake*, 179 F.3d at 1007 (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir.1991)). Because qualified immunity pro-

1007 (6th Cir.1999) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Hence, a government official who acts in his or her official capacity is immune from personal civil liability if the challenged conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727; *see Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken.").

▇▇ In order to determine whether an official is entitled to qualified immunity, the Court should initially consider if the alleged acts violated clearly established law. *See id.* The purpose of this prong is to "ensure that defendants 'reasonably can anticipate when their conduct may give rise to liability.' " *United States v. Lanier*, 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (quoting *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)) (discussing effective equivalence of civil "clearly established law" and criminal "fair warning" standards). To uphold such a purpose, it is not necessary for the alleged conduct to have violated the law under the particular theories that have been advanced in this case. *See generally Anderson*, 483 U.S. at 640, 107 S.Ct. 3034 ("[It] is not [correct] to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.") (citations omitted). Instead, the question is whether the unlawfulness of the action is apparent. *See id.*

▇▇ Second, the Court is encouraged to ask "whether a reasonable person in the defendant's position would have known that his . . . actions violated clearly established rights." *Blake*, 179 F.3d at 1008. This determination invokes a purely objective standard. The official's subjective intent is irrelevant. *See id.* (citing *Crawford–El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998)).

## B

▇▇ In the absence of exigent circumstances, it is well settled that an executive official cannot act with deliberate indifference in the creation of policies and practices. Hence, in the employment context, Tripett could neither punish Taylor by exposing her to an existing risk nor affirmatively create a new danger that made her more vulnerable to a harm. In this jurisdiction, the Constitution prevents an executive official from materially increasing the danger to which he renders other identifiable persons vulnerable. The Court concludes that the rights which were allegedly violated by Tripett have been clearly established.

Moreover, a reasonably responsible person, such as the warden in the case at bar, should have been aware of these basic standards. The precedential opinions in this area of law have frequently been discussed or have arisen in the context of prison management. *See, e.g., Lewis*, 523 U.S. at 851–54, 118 S.Ct. 1708 (discussing varying standards controlling creation of prison policy and suppression of prison

---

vides immunity from liability in a federal court, "a party may immediately appeal a district court's denial of qualified immunity."

*Blake*, 179 F.3d at 1007 (citing *Behrens v. Pelletier*, 516 U.S. 299, 307, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)).

riots). At this stage in the proceedings and utilizing the standards of evaluation that are associated with motions for dispositive relief, the Court preliminarily concludes that Tripett, as the TCF warden, (1) was on notice that some of the inmates under his supervision and control had recent histories of violence with knives and (2) had access to the criminal history of Taylor's assailant, which included a record of a recent knife-related sexual assaults.[15] Thus, the doctrine of qualified immunity will not shield Tripett from liability on the narrow claim that remains.

## VI

For the reasons that have been set forth above, Tripett's motion is granted in part, and denied in part.

IT IS SO ORDERED.

---

**15.** The Court makes no pronouncement as to Tripett's subjective state of mind. It is possible, and perhaps presumable, that he did not actually know that the policy was unconstitutional. However, such matters are irrelevant to the doctrine of qualified immunity.