# STATE OF MICHIGAN

# COURT OF APPEALS

MARK A. ROSEMAN and LUZATER
ROSEMAN,

UNPUBLISHED
May 7, 2015

Plaintiffs-Appellees,

v

No. 314650
Wayne Circuit Court
LC No. 11-011214-NO

CITY OF DETROIT,

Defendant,

and

MUKASH PATEL, DENNIS STOKES, and
WILLIAM MCPHERSON,

Defendants-Appellants.

Before: CAVANAGH, P.J., and METER and SHAPIRO, JJ.

PER CURIAM.

Plaintiff Mark Roseman, a 29-year-old married father of two, was a journeyman cable splicer employed by the Detroit Public Lighting Department (DPLD). On June 5, 2011, while plaintiff was underground conducting a repair to a cable, a second cable at the same location carrying 24,000 volts exploded into flames.[1] Plaintiff survived but, according to his complaint, was catastrophically burned and remains completely disabled.

Plaintiff filed suit against several individuals who held supervisory positions within the DLPD.[2] Defendant Patel was the manager of the DPLD. Defendant Stokes was the superintendent of construction and maintenance, which included responsibility for the day-to-day operations of the Construction and Maintenance Division, the purview of which included the

---

[1] Witnesses described flames shooting up 10-15 feet from the manhole and the ground shaking.

[2] Plaintiff also sued the City of Detroit. The trial court granted the city's motion for summary disposition under MCR 2.116(C)(7) and that ruling is not at issue in this appeal.

-1-

servicing and repair of underground cables. Defendant McPherson was the acting cable splicer general foreman.

The individual defendants, as government agents, are immune from liability unless they acted with gross negligence that was the proximate cause of the injury or damage. MCL 691.1407(2)(c). Defendants filed a motion for summary disposition on the grounds that plaintiff had failed to allege facts that could constitute the proximate cause of his injuries.[3] The individual defendants appeal by right from the trial court's denial of their motion for summary disposition under MCR 2.116(C)(7)[4] and (C)(10)[5] and we affirm.

Plaintiff was originally hired by the DPLD as a cable splicer apprentice and, upon completion of his apprenticeship in 2009, became a journeyman cable splicer. In this position, plaintiff's duties primarily involved descending 10 feet underground into confined spaces to repair high voltage cables providing electrical service to Detroit.

Until 2010, the City of Detroit operated its own power generation facility, known as the Mistersky Power Station ("MPS").[6] Power from the MPS was transmitted to substations

---

[3] Defendants' motion did not argue that plaintiff had failed to allege facts sufficient demonstrate gross negligence.

[4] A trial court's grant of summary disposition pursuant to MCR 2.116(C)(7) is reviewed de novo. See *Waltz v Wyse*, 469 Mich 642, 647; 677 NW2d 813 (2004). "In determining whether summary disposition was properly granted under MCR 2.116(C)(7), this Court 'consider[s] all documentary evidence submitted by the parties, accepting as true the contents of the complaint unless affidavits or other appropriate documents specifically contradict them.'" *Id*. at 647-648, quoting *Fane v Detroit Library Comm*, 465 Mich 68, 74; 631 NW2d 678 (2001); MCR 2.116(G)(5).

[5] This Court reviews de novo a trial court's grant of summary disposition under MCR 2.116(C)(10). *Ernsting v Ave Maria College*, 274 Mich App 506, 509; 736 NW2d 574 (2007). "When deciding a motion for summary disposition under MCR 2.116(C)(10), a court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted in the light most favorable to the nonmoving party." *Id*. at 509-510. All reasonable inferences are to be drawn in favor of the nonmoving party. *Dextrom v Wexford Co*, 287 Mich App 406, 415; 789 NW2d 211 (2010). "Summary disposition is proper under MCR 2.116(C)(10) if the documentary evidence shows that there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Ernsting*, 274 Mich App at 509. "This Court is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008). "A genuine issue of material fact exists when the record, giving the benefit of any reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds could differ." *Ernsting*, 274 Mich App at 510.

[6] The following facts are gleaned from plaintiff's complaint and the documentary evidence he submitted to be proferred at trial. To the extent any of these factual allegations are disputed by

throughout the city via high power cable trunk lines ("trunk lines"). These lines are generally located underground and accessed through manholes. The trunk line system was many decades old and no preventative maintenance was performed on any of the trunk lines for many years preceding plaintiff's injury. In order to avoid cable failures in the aging system, the DPLD had placed a specific engineer in charge of manually balancing the power load among the various trunk lines in order to prevent any individual line from carrying more stress voltage than it was designed for. This practice was apparently substantially successful.

However, in 2009, that engineer was transferred and not replaced. Shortly thereafter, in 2010, the DPLD ceased power generation at the MPS and connected the MPS trunk lines directly to power provided by Detroit Edison. Following these two changes, there was an "extremely high and abnormal" increase of failures of the MPS trunk lines, as many as 25-30 per month. The "Canfield 60" line in particular suffered multiple failures despite the fact that it had not suffered any failures in the previous four years.

When a trunk line cable would fail, the DPLD's crew of cable splicers (including plaintiff) would be sent to repair it. The failed cable would be de-energized at its source before the workers arrived at the underground locus of the failure (which they would access by manhole). However, the other cables at that location would remain in operation and the electrical load from the failed cable would be transferred to these other cables, sometimes increasing demand beyond their capacity. On the date of plaintiff's injury, there was a failure of the "Porter 24" trunk line near a manhole at Lafayette. The manhole servicing that line contained as many as 13 other trunk lines as well, including the Canfield 60 line. According to the testimony of another cable splicer, when the first line was shut down, there was "an overload on Canfield 60, and it blew."

Beginning about six months before the subject explosion, plaintiff and the rest of the underground cable splicer crew regularly complained about the abnormal and unusual increase in cable trunk line failures and advised defendants that the job had become "very dangerous and unsafe." Several months before the subject explosion, the crew met with all three individual defendants. One of the crew members advised defendants that "somebody was going to get killed because we do not have the proper safety equipment." They requested safety equipment including kevlar blankets to place over cables in order to prevent the arcing that can trigger electrical fires or explosions and to minimize the effects should one occur, a rapid extraction device to quickly remove workers out of manholes in the event of a fire, fire retardant clothing, and an infrared gun to identify cables approaching failure. At this meeting, Patel assured the crew that these items would be provided. However, they were not provided.

According to plaintiff, he had a subsequent conversation with McPherson, who advised him that Patel never kept his promises regarding the provision of equipment. Plaintiff later told McPherson that, "going into these underground manholes to repair a failed cable is like playing Russian Roulette," to which McPherson responded, "No it is worse than that."

---

defendants, we are required to view the facts in the light most favorable to the nonmoving party, in this case, plaintiff. *Waltz*, 469 Mich at 647-648; *Ernsting*, 274 Mich App at 509-510.

Viewing these facts in the light most favorable to plaintiff, defendants (1) were aware of the abnormal amount of cable failures after the shutdown of the MPS, (2) made no attempt to fix the problem, (3) promised to provide plaintiff and his coworkers with protective equipment such as kevlar blankets, fireproof clothing, and a rapid extraction system, but never did so, and (4) removed and failed to replace the engineer whose job was to balance the electrical load to prevent any overloading of the aging trunk lines. Defendants have not suggested that the explosion and fire was caused by anything other than the cable overload problem that had caused multiple failures during the previous months.

As we explained in *Radu v Herndon & Herndon Investigations, Inc*, 302 Mich App 363, 382; 838 NW2d 720 (2013):[7]

> MCL 691.1407(2) generally provides that a governmental agency's employee is immune from tort liability for an injury caused by the employee while in the course of employment if (a) the employee was acting within the scope of his or her authority, (b) the governmental agency was engaged in the exercise of a governmental function, and (c) the employee's conduct did not amount to gross negligence that was the proximate cause of the injury.

As used in MCL 691.1407(2)(c), the phrase " 'the proximate cause' is best understood as meaning the one most immediate, efficient, and direct cause preceding an injury." *Robinson v Detroit*, 462 Mich 439, 458-459; 613 NW2d 307 (2000). Thus, for plaintiff to avoid the application of governmental immunity, defendants' gross negligence must have been *the* proximate cause of his injuries. In other words, it is insufficient for plaintiff to demonstrate that defendants' actions and omissions were a cause-in-fact or just one of several proximate causes. *Tarlea v Crabtree*, 263 Mich App 80, 92; 687 NW2d 333 (2004). However, if reasonable jurors could find that defendants' actions and omissions[8] were *the* proximate cause of plaintiff's injuries, summary disposition is inappropriate. See *Robinson*, 462 Mich at 463.

The cases relied upon by defendants in support of their position are unpersuasive and readily distinguished. In *Kruger v White Lake Twp*, 250 Mich App 622, 623-624; 648 NW2d 660 (2002), the decedent escaped from a makeshift holding cell in a police station, ran into traffic, and was killed. This Court, assuming that the police officers' actions were grossly negligent, found several "other more direct causes" of the decedent's death, "e.g., her escape and flight from the police station, her running onto M-59 and into traffic, and the unidentified driver hitting [] decedent." *Id.* at 627. In this case, defendants have offered no evidence of "other more direct causes" of plaintiff's injuries. Defendants repeatedly failed to address the known danger

---

[7] "The applicability of governmental immunity is a question of law, which we [] review de novo." *Briggs v Oakland Co*, 276 Mich App 369, 371; 742 NW2d 136 (2007).

[8] See *Tallman v Markstrom*, 180 Mich App 141, 144; 446 NW2d 618 (1989) (holding that a purely omissive act may constitute gross negligence under MCL 691.1407).

-4-

of the failing and overloaded lines and, equally important, failed to provide necessary safety equipment to minimize injury in the event of a catastrophic failure during repair. There is no allegation or evidence that plaintiff was improperly performing his duties or should not have been in the subject manhole.

Defendants also rely on *Love v Detroit*, 270 Mich App 563, 564; 716 NW2d 604 (2006). In that case, several people were killed in an apartment fire and their estates brought suit alleging that firefighters had been negligent in fighting the fire. *Id*. However, there was no claim that the firefighters were responsible for the instigation of the fire or for any lack of smoke alarms or sprinkler system. This Court noted that "[t]he fire was advanced by the time the firefighters arrived at the home. . . . [N]o evidence established that the firefighters could have reached the victims or that, if firefighters had acted more aggressively, the victims would have been rescued." *Id*. at 566. By contrast, in this case, plaintiff does not allege that defendants were grossly negligent in failing to take action to quickly rescue him *after* the explosion. Rather, he alleges that they were responsible for the explosion itself and for the lack of safety equipment that would have minimized his injuries. For the same reason, *Dean v Childs,* 474 Mich 914; 705 NW2d 344 (2005), does not support defendants' argument. In that case, the plaintiff's four children died in a fire allegedly started by an arsonist. *Dean v Childs*, 262 Mich App 48, 51; 684 NW2d 894 (2004), rev'd in part 474 Mich 914 (2005). Our Supreme Court, agreeing with the dissenting Court of Appeals judge, concluded that *the* proximate cause of the tragedy was the actions of the arsonist who set the home ablaze. *Dean*, 474 Mich at 914; *Dean*, 262 Mich App at 59-63 (Griffin, J., concurring in part and dissenting in part). However imperfect the attempted rescue may have been, a fire set by a third-party criminal actor was the fundamental cause of the decedents' deaths.

The other reported case relied on by defendants, *George v Michigan*, 136 F Supp 2d 695, 697-698 (2001), is also inapposite. In that case, the decedent was pulled over while driving and a Michigan State Police officer required that she step out of the vehicle to perform field sobriety tests. *Id*. While she was outside the vehicle, another car travelling at excessive speed went out of control in the area and, despite the officer's attempts to pull her out of danger, the decedent was struck by the car and killed. *Id*. The federal court found that the most proximate cause of the decedent's death was the second vehicle. *Id*. at 703. In the instant case, however, there was no superseding and more immediate cause of plaintiff's injuries other than the alleged actions and omissions by defendants. Indeed, in *George*, the allegedly negligent officer attempted, within the best of his ability, to pull the decedent out of the way of the second vehicle; in this case, defendants failed to take any remedial or safety measures to protect plaintiff and his coworkers.

Affirmed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Patrick M. Meter
/s/ Douglas B. Shapiro